**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GENERAL WOOD PRESERVING COMPANY; Burke–Parsons Bowlby, Respondents.**

No. 88–1331.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1989.

Decided June 18, 1990.

As Amended July 2, 1990.

Robert Francis Mace, N.L.R.B., Washington, D.C., for petitioner.

Charles A. Edwards, Graham & James, Raleigh, N.C., for respondents.

Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking, Supervisory Atty., N.L.R.B., Washington, D.C., on the brief, for petitioner.

Before MURNAGHAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation.

STAKER, District Judge:

This case was instituted here pursuant to section 10(e) of the National Labor Relations Act (Act), 29 U.S.C.A. § 160(e) (West

1973),[1] by the National Labor Relations Board (Board) seeking enforcement of a *Gissel* bargaining order [2] entered by the Board against Burke–Parsons Bowlby (Bowlby) and General Wood Preserving Company (General Wood), respondents herein. Enforcement of the Board's order against each of them is granted.[3]

Hearing was held by an Administrative Law Judge (ALJ) upon unfair labor practices charges filed pursuant to the Act against Bowlby and General Wood, respectively, in consolidated cases 11–CA–11282, 11–CA–11376 and 11–CA–11487. Both Bowlby and General Wood filed answers denying the charges against them in those cases. General Wood did, but Bowlby did not, appear at the hearing held before the ALJ therein, nor did anyone participate at that hearing on behalf of Bowlby. The ALJ rendered his decision therein on June 20, 1986, which included an order recommended by him for adoption and entry by the Board. The Board affirmed the ALJ's findings and conclusions contained in that decision and adopted the recommended order.[4]

The Board's order required Bowlby and General Wood, as Bowlby's successor at a wood-treatment plant at Leland, North Carolina (plant), which Bowlby had owned and operated for some time prior to Bowlby's sale thereof to General Wood on June 29, 1984,[5] to recognize and bargain collectively with the International Woodworkers of America, AFL–CIO (the Union), as the collective bargaining representative of a unit consisting of all production and mainte-nance employees at the plant, a majority of whom, the ALJ found, had signed petitions selecting the Union as such representative; to offer to hire seven employees hereinafter named who had been employed by Bowlby at the time of that sale, whom the ALJ found General Wood had refused to hire, in violation of section 8(a)(1) and (3) of the Act, because of their union activities; and to make those employees whole by paying them back pay with interest and restoring to them the seniority and other employment rights and benefits to which they would have been entitled but for General Wood's discriminatorily having refused to hire them for that reason.

The ALJ's findings and conclusions, as affirmed by the Board, are respectively sometimes herein said to be those of the ALJ and at others those of the Board.

I

*Proceedings in This Court*

On September 7, 1988, the Board filed its initial application here seeking enforcement of its order against respondent General Wood only, and on October 7, 1989, filed an amendment to that application wherein both Bowlby and General Wood were joined as respondents and enforcement of the Board's order was sought against both of them. General Wood timely responded thereto.

Through oversight the Clerk of this Court did not serve upon Bowlby notice of

1. Section 10(e) of the Act empowers the Board "to petition any court of appeals of the United States ... wherein the unfair labor practice in question occurred ... for the enforcement of" the Board's orders and provides that "[u]pon the filing of such petition, the court shall ... have jurisdiction of the proceeding and of the question determined therein...."

2. So-called from *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), wherein the Court approved the Board's issuance of such an order.

3. The Board entered an order against General Wood on May 12, 1988, but failed to include Bowlby therein. On September 30, 1988, the Board entered another order against both Bowlby and General Wood which, except in particu-lars not material here, contained the substance of its May 12, 1988, order. Those two orders are herein referred to as the "Board's order."

4. In so doing, the Board effected minor modifications to that decision and recommended order, none of which are material to the issues here.

5. The ALJ had found that General Wood had attained that successorship status at least by the end of July 1984, when General Wood had hired employees in the pre-existing classifications and had employed a complement of 44 employees in the unit that had been established at Bowlby prior to General Wood's purchase of the plant.

the filing of the amended application nor disclose to the Court that it had been filed.

In the mistaken belief that General Wood was the only party respondent herein, following the hearing of arguments in March 1989 the Court prepared its decision, dated February 16, 1990, enforcing the Board's order as to General Wood only, whereupon the Board informed the Court that Bowlby had also been joined as a respondent and moved that the decision be corrected such that the Board's order also be enforced against Bowlby. General Wood did not object to that motion.

Bowlby then appeared generally herein by filing its motion for permission to plead or to answer the Board's motion, in substance asserting as ground therefor that Bowlby and its counsel, Mr. Holroyd, assumed that Bowlby's interests in this action were being protected by Mr. Edwards, General Wood's counsel, for which reason Bowlby did not theretofore appear herein. In response to Bowlby's motion, General Wood asserted that Bowlby incorrectly so assumed, and attached to that response was a copy of a letter from Mr. Holroyd to Mr. Edwards, dated October 12, 1988, stating "You [Mr. Edwards] are correct in your assumption that ... [Bowlby] does not want to participate any further in this case."

On March 20, 1990, this Court entered an order directing the clerk thereof to serve upon Bowlby the amended application filed against Bowlby herein by the Board and granted Bowlby leave within thirty days to file an answer to that amended application and to file an answer to the Board's motion to correct this Court's February 16, 1990, decision. Bowlby did not file an answer to either that amended application or to the Board's motion to correct that decision.

On April 12, 1990, this Court entered an order staying the Court's mandate then in effect herein until further order of the Court.

By letter from the clerk of this Court to Mr. Holroyd, Bowlby's counsel, dated March 29, 1990, Bowlby was requested to file a brief herein, in response to which Mr. Holroyd informed the clerk by letter of April 5, 1990, that "[U]pon review of the record in this matter and consultation with ... [Bowlby] we do not desire to file a brief as provide [sic] in your March 29, 1990 letter."

Bowlby having declined to file herein an answer, or a brief as required by Rule 15.1, Federal Rules of Appellate Procedure, or otherwise to respond to either the Board's amended application or its motion to correct the February 16, 1990, decision, an order was entered by the Court on April 30, 1990, enforcing the Board's order against Bowlby as well as General Wood.

Thus, it is only the contentions of the Board and General Wood, respectively, which are dealt with in Part III hereof, that raise the issues to be decided by the Court.

## II

### *Bowlby's Role*

Since the bargaining order sought to be enforced by the Board against General Wood is based upon the ALJ's conclusion that General Wood was Bowlby's successor, before addressing the issues between the Board and General Wood it is necessary to discuss the conclusions reached by the ALJ as to Bowlby in order fully to understand and evaluate some of the evidence upon which the ALJ based his findings and conclusions as to General Wood.

Except as indicated to the contrary, those reached as to Bowlby were based upon undisputed fact and evidence and documentary evidence, and in substance are as follows.

### *Majority Selection of the Union*

On February 12, 1984, Bowlby employed sixty-four production and maintenance workers at the plant.[6] Early in February

---

**6.** The ALJ calculated that when the 21 employees who were not production and maintenance workers at the plant were deducted from the total of all of Bowlby's employees there, num- bering 86, there remained 64, and not 65, production and maintenance employees in the unit. The total number of such unit employees was more likely 62, since 50 of them purportedly

1984 some of them engaged in a walkout and communicated with the Industrial Union Department (IUD) of the AFL–CIO concerning union representation of them at the plant.

█ Michael Black of the IUD met with some of them and informed them that he would need to determine which affiliate union he would recommend most appropriately to represent them. At that meeting 26, and thereafter others, of the unit employees at Bowlby signed single-purpose petitions authorizing the AFL–CIO or its appropriate affiliate to represent them in collective bargaining with Bowlby. At a second meeting with Black, the employees in attendance thereat by voice vote selected the Union as the AFL–CIO affiliate to do so. The ALJ found 42 of the signatures on those petitions to be authentic, that those 42 signatures constituted those of a majority of the 64 production and maintenance employees comprising the appropriate unit at the plant in February, and that the lack of designation on those petitions, at the time they were signed, of the Union as the appropriate AFL–CIO affiliate to represent them was not a legal impediment to the attainment of that majority status.[7]

### Bowlby's Unfair Labor Practices

On February 9, the Union formally notified Bowlby by mailgram that the Union represented a majority of Bowlby's production and maintenance employees at the plant and requested that Bowlby recognize the Union as their collective bargaining representative. Bowlby refused to do so, the Union petitioned the Board for a representative election at which those employees could vote as to whether the Union would do so, and in mid-March, the Board scheduled an election to be had on April 6 pursuant to a stipulation of election executed by Bowlby and the Union. That stipulation defined the appropriate unit to consist of the production and maintenance employees at Bowlby, excluding employees performing all other work at the plant.

The ALJ found and concluded that during February, March, and April, through its supervisors, production manager, and president, Bowlby committed the following acts, each of which constituted a violation of section 8(a)(1) of the Act:[8] Supervisor Gary Wood stated to employee Larry Brown that, if the employees selected the Union, they would lose their paid holidays and would have to start from scratch (an unlawful threat of loss of benefits); Plant Manager Carl Williams stated to employees Larry Brown, Michael Robinson and others that in that event they and he might as well look for another job (a threat of the plant's closure and the loss of their jobs); Supervisor Jimmie Smith stated to employees Warren Bryant and Alexander Hall that in that event everyone should plant a garden because they were going to be on the soup line and the plant would be closed (unlawful threats of plant closure and the loss of their jobs); Supervisor Smith stated to employee Warren Bryant that in that event they would lose benefits including "boot money" (an unlawful threat of loss of benefits); Supervisor Smith stated to employee Oliver Munn that in that event the employees were going to wind up in the soup line (an unlawful threat of the loss of

signed the petitions opting for Union representation and 12 of them did not. Whether the unit numbered 62, 64, or 65 is not critical to the majority issue, because the signatures of at least 41 of them on the petitions were authenticated, a clear majority.

7. Such was not an impediment in the absence of a showing that the employees who signed the petitions did not intend to authorize the Union, as an AFL–CIO affiliate, to represent them. *See NLRB v. Cam Industries, Inc.,* 666 F.2d 411 (9th Cir.1982). Here there was no showing that any of the signers of the petitions did not intend to authorize the Union so to act. As the ALJ pointed out, there was no evidence that any of

the signers of those petitions ever attempted to revoke their signatures on any of them.

8. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C.A. § 158(a)(1) (West 1973). Section 157 provides in part that "employees shall have the right to self-organization, to form, join or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C.A. § 157 (West 1973).

their jobs); Supervisor Percy Burns stated to employee John Ganey that if the employees kept going the way they were with the Union, the plant would shut down (an unlawful threat of plant closure); Supervisor Bill Caldwell stated to employee Greg Burton that when you sit down to bargain, you lose all benefits (an unlawful threat of loss of benefits if the employees selected the Union); Bowlby's president, Richard Bowlby, stated at a meeting attended by Bowlby's Plant Manager Carl Williams and employees Michael Robinson and Paul Bowens that if the Union came in, he would ship poles out and get them peeled cheaper (an unlawful threat of subcontracting work); and Supervisor Smith interrogated employee George Jenkins concerning what he thought of the Union in an environment that was not free of unfair labor practices and hence was a part of an overall campaign of unlawful interrogation and coercion.

\* \* \* \* \* \*

On March 30, Bowlby's president, Richard Bowlby, wrote a letter to the employees in which he stated:

> There are no problems that exist in this plant that we cannot work out among ourselves without the high risk the union brings. This much I promise you—we will work out our problems—we will do this with or without the union. We can do it easier and better without the union. . . . [T]hink carefully about this union and what it can cost you. You know what you now have. Don't vote yourself into a sea of trouble.

The ALJ concluded that the promise in that letter to "work out our problems" was an unlawful promise of benefits to induce the employees to reject union representation and a violation of section 8(a)(1) of the Act, and that the reference therein to the "high risk" the union would bring and the statement therein that the employees

should not "vote themselves into a sea of trouble" were unlawful, unspecified threats of reprisal if the employees chose union representation and constituted a violation of section 8(a)(1) of the Act.

\* \* \* \* \* \*

Prior to the representation election scheduled on April 6, Bowlby brought to the plant 25 of its employees from other states, placed their names on its list of employees to vote in that April 6 election, kept them segregated from other employees there, housed them in a motel at Bowlby's expense, fed them from specially catered trucks, and did not require them to wear shirts or hard hats as was required of other Bowlby employees. Some of them told employees Alexander Hall and Greg Burton that they were brought in for the express purpose of voting in the election and would leave the day after it was to be held. As a result of charges filed by the Union, the April 6 election was blocked and all but four of those 25 out-of-state employees left on April 7, and Bowlby's records thereafter ceased to show them as having worked any hours.

The ALJ found and concluded that in so doing Bowlby engaged in "unit packing" in an attempt to capture the election and thereby violated section 8(a)(1) of the Act.

\* \* \* \* \* \*

The ALJ found and concluded that, from late February into late June, Bowlby unlawfully, and in violation of the Act as stated below, issued warnings and suspension against the following employees, respectively, all of whom had actively supported the Union.[9]

### Warren Bryant

Bryant engaged in the walkout, signed a union petition, wore a "Vote Yes" pin for a time and urged his fellow employees to support the Union.

---

**9.** The ALJ's conclusions pertaining to these warnings and the suspension were based upon a preponderance of the evidence, which was unrebutted except for that of Bowlby's Production Manager, Thomas Greene, who testified that he came to the employ of Bowlby in that capacity in December 1983 and in January 1984 com-

menced to issue disciplinary warnings to employees. The ALJ found that it was only after the advent of the Union campaign, beginning in early February, that Bowlby commenced to issue such warnings and that its doing so manifested a marked interest in then enforcing rules that had not theretofore been enforced.

He was absent from work on May 21 because of car trouble and telephoned his foreman, Jimmie Smith, to inform him of that fact. Smith told him to hurry to work. He was unable to fix his car that day and reported to work on the following day, when Production Manager Greene called him to his office and issued him a written warning for not reporting to work the day before.

The ALJ found that warnings had theretofore been issued to employees for failing to report to work only when they had failed to "call in," and that Bowlby had violated section 8(a)(1) and (3)[10] of the Act by the issuance of that warning to Bryant.

#### Warren Jacobs

Jacobs engaged in the walkout, attended union meetings, signed a union petition, passed out union leaflets at the gate and obtained the signature of other employees on petitions. His supervisor was aware of his union support.

On May 21, he received a written warning from Production Manager Greene for being late for work notwithstanding his presentation of a doctor's excuse in explanation of his tardiness. Jacobs was aware of no instance theretofore in which a warning had been issued to a tardy employee who had presented a doctor's excuse.

The ALJ concluded that Bowlby had violated section 8(a)(1) and (3) of the Act by issuing the warning to Jacobs.

#### George Jenkins

Jenkins attended a Union meeting, signed a petition, discussed his support of the Union with other employees and told his supervisor that he hoped the employees got the Union in so that it would help them to receive better benefits.

On February 27, he stopped operating a pole machine because of heavy rain and gave that as his reason for having done so to his supervisor, Kenny Smith, who told him he could wait a few minutes until the rain slackened and then restart the machine. The next day Production Manager Greene issued to him a written warning for being "unwilling to work due to weather conditions."[11]

The ALJ concluded that Bowlby had violated section 8(a)(1) of the Act by issuing a warning to Jenkins.[12]

#### Greg Burton

From the outset, Burton had been a leader in the move to unionize the plant's production and maintenance employees, actively participated as their designated spokesman for a time, engaged in the walkout, contacted the AFL–CIO's IUD on their behalf, met with IUD coordinator Black, signed a union petition, wore T-shirts reading "100 percent Union," spoke at meetings held by Production Manager Greene and Plant Manager Carl Williams and met with Bowlby's president concerning employees' complaints.

On June 13, Greene gave Burton a written warning that had been dated June 12, which noted thereon days on which he had been late for, or absent from, work, including an instance on June 11 when Burton had left early. Immediately after giving him that warning on June 13, Greene issued to him a three-day suspension from work because of his failure to report for work on June 12 and because of the written warning given him on June 13.[13]

---

**10.** Section 8(a)(3) of the Act provides it to be an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" by "discrimination in regard to hire or tenure of employment or any term or condition of employment...." 29 U.S.C. § 158(a)(3) (West 1973).

**11.** Greene testified that other employees had not ceased work because of the rain, but later testified that he was not certain as to what happened because he was not personally present at the time.

**12.** The ALJ concluded that Bowlby had thereby also violated section 8(a)(3) of the Act; however, the Board's order struck that conclusion from the decision, because a violation of section 8(a)(3) as to Jenkins in respect to this warning has not been alleged.

**13.** Burton testified that his supervisor, Tom Sweeney, as well as Greene, granted him permission to leave work early on June 11. Greene testified that he did not remember discussing with Burton his leaving early on June 7 and 11,

The ALJ concluded that after the advent of the Union's campaign, Bowlby suddenly commenced to enforce rules concerning tardiness, absenteeism and work performance that had not theretofore been enforced, that Bowlby was discriminatorily motivated to do so as its response to the Union's campaign and that Bowlby thereby violated section 8(a)(1) and (3) of the Act.

## III

### General Wood's Role

The Board contends that the findings and conclusions reached by the ALJ in his decision, as affirmed by the Board, were supported by substantial evidence on the record as a whole and that the Board acted properly within its broad remedial discretion in issuing its bargaining order against General Wood.

In substance, General Wood contends that there was not substantial evidence on the record to support, and that the ALJ erred in finding: (a) that the signatures affixed to petitions selecting the Union to be the collective bargaining representative of the employees in the unit at Bowlby were the authentic signatures of a majority of those employees;[14] (b) that General Wood had notice of unfair labor practices committed by Bowlby prior to General Wood's purchase of the plant; (c) that General Wood's refusal to hire the seven former employees of Bowlby was in any way related to those employees' union activities; (d) that General Wood is Bowlby's successor; and (e) that the end of July 1984 was the appropriate "substantial and representative complement" date in respect to General Wood's work force in the unit at the plant. And General Wood asserts that even if substantial evidence on the record does support the issuance of a bargaining order against Bowlby, the evidence does not support the issuance of the bargaining

order against General Wood, hence the one against General Wood was improperly issued.

Section 10(e) of the Act provides in part that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." Accordingly, if the ALJ's findings of fact, as affirmed by the Board, with which General Wood takes issue, "have substantial support in the record as a whole, our inquiry ends ... even though we might have reached a different result had we heard the evidence in the first instance." *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984), *citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence has been held to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Aquabrom, Div. of Great Lakes Chemical*, 855 F.2d 1174, 1178 (6th Cir.1988).

### The Majority (Authentication) Issue

■ General Wood's claim that there is not substantial competent evidence on the record to support the Board's finding that the signatures of a majority of the employees in the unit, subscribed to the petitions by which those employees selected the Union to be their bargaining representative, were the authentic signatures of those employees is demonstrably without merit.

Seven separate, single-page petitions upon which appear 50 signatures[15] purporting to be those of employees in the unit were admitted into evidence. The only evidence bearing upon their authenticity was presented by General Counsel, none of which was rebutted. The ALJ held 42 of them to be authentic.

The evidence establishes that 17 of those 50 signatures were authenticated by the

---

and that Burton had telephoned on one occasion when he was late for work.

**14.** General Wood asserts that some of those signatures were not authenticated by the ALJ by competent evidence; otherwise, General Wood does not question any of the findings and conclusions reached by the ALJ as to Bowlby.

**15.** Despite literary rules dictating the contrary, in the interest of readability numbers of employees and signatures are expressed in figures herein.

testimony of the 17 employees who identified them to be their own and that 6 others of them were authenticated by witnesses who testified that they observed 6 named employees affix them thereto as their own. The authenticity of still 5 others of them is established by comparing them with what the undisputed evidence established to be the authentic specimens, on other documents of evidence, of the signatures of those 5 employees, from which it is clear that their signatures on the petitions are in fact their authentic signatures. Thus, there is substantial and competent evidence in the record to establish the authenticity of 28 of those 42 signatures the ALJ held to be authentic.

Section 10(b) of the Act provides that proceedings conducted by the Board or its agent "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States...." Rule 101, Fed.R.Evid., provides "[t]hese rules govern proceedings in the courts of the United States...." Hence, proceedings conducted by the Board or its agent, such as those that were conducted by the ALJ, are to be conducted in accordance with the Federal Rules of Evidence. Rule 901(a) and (b)(1) and (3), Fed. R.Evid., permits signatures to be authenticated by the methods by which the 28 signatures were demonstrated to have been authenticated.[16] *See Colson Corp. v. NLRB,* 347 F.2d 128, 134 (8th Cir.1965), *cert. denied,* 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157 (1965) (a signature may be authenticated by the testimony of a witness to the execution thereof by its subscriber as well as by a comparison of the signature with a known specimen of the handwriting of the person claimed to have subscribed it).

■ Two of the seven petitions contained a total of 26 signatures. Of those 26 signatures, 11 are included among the 17 signatures on all seven of the petitions that were authenticated by the testimony of the employees who affixed them thereto, as set forth above, which leaves the remaining 15 of them to depend for their authentication solely upon the testimony of IUD coordinator Michael Black.

Black testified that he met in a union hall on February 7, 1984, with 26 of Bowlby's employees; that he sat at a head table there with those employees facing him; that he first passed among them an attendance sheet; that he then displayed to them a blank form of the petitions and read to them the matter appearing at the top thereof [17] and explained to them that a majority of the employees would be required to sign such a petition authorizing the union to represent them at Bowlby before the Union could do so; and that if he could recall correctly, most if not all of those 26 employees signed those two petitions at the table at which he sat, but that there may have been one or two of them who signed their names thereto away from that table,[18]

---

**16.** Rule 901(a) and (b)(1) and (3), Fed.R.Evid., provides:

(a) The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony that a matter is what it is claimed to be.

\* \* \* \* \* \*

(3) Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

**17.** That matter at the top of the petitions reads: THIS WILL AUTHORIZE THE AFL–CIO AND/OR ITS APPROPRIATE AFFILIATE TO REPRESENT ME IN COLLECTIVE BARGAINING WITH MY EMPLOYER.
This will also authorize said union to use my name for the purpose of organizing *Burke–Parsons–Bowlby in Wilmington, N.C.*
This may include sending my name to the company with a copy of (sic) the National Labor Relations Board as well as in the signing of union leaflets.
Appearing on the petitions immediately below the above-quoted matter are five columns respectively headed "Name," "Address," "Date," "Tel No.," and "Job."

**18.** Devant Graham's signature appears on the attendance sheet but not on either of the two petitions. Stanford Graham's signature appears on one of the two petitions but not on the attendance sheet. Otherwise, all 26 signatures appearing on each of the attendance sheets and on the two petitions correspond.

and that after the petitions were signed, they were handed back to him and retained in his custody.

General Wood asserts, in substance,[19] that the Board has the burden of establishing the authenticity of the signatures of a majority of the employees in the unit on the petitions, with which the Court agrees, and further asserts that Black's testimony is not competent evidence to establish the authenticity of any of the 15 signatures which depend for their authenticity solely upon his testimony, wherefore the Union did not in fact attain majority status and the ALJ and the Board erred in holding that it had done so, citing *Maximum Precision Products, Inc.*, 236 N.L.R.B. 1417, 1424 (1978), and *Stop N'Go, Inc.*, 279 N.L.R.B. No. 52 (1986).

The facts here are distinguishable in critical particulars from those in *Maximum* and *Stop N'Go*. In each of them the employees signed the cards out of the presence of the witnesses by whose testimony the employees' signatures were sought to be authenticated and then delivered those cards to other persons who delivered them to those witnesses at a later time, and those witnesses did not observe the signers of the cards affix their signatures thereto nor did those signers themselves deliver those cards to those witnesses with their signatures affixed thereto. Here all 26 employees whose signatures appear on the two petitions subscribed their names thereto in Black's presence, except that one or two of them may have done so away from the table at which he sat and at a point elsewhere in the same room.[20] Black's testimony thus established that he personally observed at least 24 of those 26 employees affix their signatures to those two petitions. Such being true—and there was no evidence to the contrary—Black personally observed 13 of those 15 employees affix their signatures to the two petitions. *See NLRB v. Howell Chevrolet Co.*, 204 F.2d 79, 85–86, *enforcing* 95 N.L.R.B. 410, *aff'd on other grounds*, 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953) (assertion of lack of authenticity of Malstom's signature on card held to be without basis for, no matter who wrote his name thereon, evidence showed he clearly adopted the signature as his own by accepting the card from, and agreeing to return it to, Leonard and thereafter returning it to Leonard with the signature appearing thereon); *Amalgamated Clothing Workers of America v. NLRB*, 419 F.2d 1207, 1209 (D.C.Cir.1969), *cert. denied sub nom. McEwen Mfg. Co. v. NLRB*, 397 U.S. 988, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970) ("[t]he other three cards were properly authenticated by testimony that the signer had returned the card to the union agent, thus adopting as his own the signature thereon."). Indeed, it is convincingly arguable that Black's testimony was competent to authenticate all 26 of the signatures on the two petitions, since each of the 26 employees whose name appears thereon accepted one of the two petitions and then in the same room himself handed or caused it to be handed back to Black with a signature thereon.

At the very least, those 13 of the total of the 15 signatures in issue were properly held to have been authenticated by the ALJ and the Board pursuant to the provisions of Rule 901(b)(1), Fed.R.Evid.

Thus, there was substantial evidence on the record to support, and the ALJ and the Board committed no error by finding and holding, that at least 41 of the signatures on the seven petitions were the authentic

**19.** The court gathers such to be the substance of General Wood's assertion in respect to the authentication issue from a footnote in its brief. There it asserts "[t]he ALJ's decision states that 42 of the 48 (sic) signatures on GC 101–107 (those being the exhibit numbers of the seven petitions) were authenticated at the hearing. This is not true. Some, but far from all, of the signatures on the original petitions [App. 229–235] (the original petitions being the two) were authenticated; there is no explanation of the failure to authenticate the remainder." General Wood's brief at 16, n. 12 (parenthetical matter interpolated).

**20.** Significantly, of the 26 signatures on those two petitions, 25 of them have the date "2–7–84" entered under the "Date" column on the same lines on which those 25 signatures appear. No date is entered in relation to one of those 26 signatures. The entry of that same date in relation to those 25 signatures is a circumstance that tends to corroborate Black's testimony.

ones of employees in the unit, that those 41 authenticated signatures constituted a majority of the signatures of the 64 or 65 employees in the unit and that the Union had thereby attained majority status.[21]

## Issue of General Wood's Knowledge of Bowlby's Unfair Labor Practices

General Wood's denial that it had adequate notice, prior to its purchase of the plant from Bowlby, of the unfair labor practices that Bowlby had committed and its assertion that there is not substantial evidence on the record to support the Board's finding and holding that it did have such notice prior to that purchase, are both without merit.

The evidence in the record bearing upon this issue is undisputed.

When General Wood was incorporated by Stanley Winbourne to act as the entity that purchased the plant from Bowlby, Winbourne became General Wood's president.

As an official of Bowlby, Winbourne had overseen the construction of the plant for Bowlby in 1973, and thereafter remained in Bowlby's employ until about 1979, following which he performed services for Bowlby in the capacity of a consultant.

Prior to General Wood's purchase of the plant on June 29, 1984, Winbourne was the only person through whom General Wood acted, except that Steve Hutchinson inventoried Bowlby's assets at the plant on behalf of General Wood.

Winbourne did not testify at the hearing held by the ALJ. The only direct evidence bearing upon the issue of whether General Wood had notice of Bowlby's unfair labor practices is the Union's mailgram to Winbourne and Steve Hutchinson's denial of his knowledge thereof, all as discussed below. However, quite apart from that mailgram, the evidence includes statements made by Winbourne and other circumstantial evidence to support the Board's finding that General Wood had such notice before its purchase of the plant on June 29, 1984.

From early March 1984 through June 29, Winbourne carried out extensive negotiations for General Wood's purchase of the plant from Bowlby.

Steve Hutchinson, who did testify, first worked for Bowlby in 1973, together with Winbourne during the construction of the plant, and thereafter worked for Bowlby off and on until the late spring or early summer of 1983, when he left Bowlby's employ to become employed by Carolina Creosote.

At least a month before the plant's purchase, Winbourne approached Steve Hutchinson and Thomas Greene, who was then Bowlby's production manager at the plant, concerning their accepting employment by General Wood there if Winbourne was successful in causing General Wood to purchase it, and he also approached many of Bowlby's supervisory staff about their doing so. After General Wood's purchase of the plant, Hutchinson became its operations manager and Greene its production manager, and James Walker, Kenny Smith, Gary Wood, Jerry Brown, Jimmie Smith, Bill Caldwell, Ted Sweeney and Percy Burns, all Bowlby supervisors, became its supervisors. Greene and some of those supervisors had been personally involved in Bowlby's unfair labor practices.

On June 20, 1984, Winbourne addressed Bowlby's employees at the plant and told them that General Wood had purchased the plant; that it would cease operations for about two weeks and would reopen in early July, when they would be hired by General Wood; and that in early July they should file applications for employment with General Wood. He also told them then that he was not in favor of the Union, but that the

**21.** Although General Wood has not, either before the ALJ, the Board, or this Court, claimed that the Union had never "timely" procured the authentic signatures on the petitions of a majority of the employees in the unit, the Court would nevertheless point out that substantial evidence on the record clearly establishes that, as of February 9, 1984, when the Union formally requested Bowlby to recognize it as the bargaining representative of the employees in the unit, the Union held petitions which bore 37 of the at least 41 signatures of the employees in the unit whose signatures were hereinabove held to be authentic, and those 37 employees then constituted a majority of the 64 or 65 employees in the unit.

decision was up to them, and that they would start their employment with General Wood with "clean slates" and their benefits would not be reduced.

It is clear from those remarks of Winbourne's that he knew of the Union's ongoing campaign for recognition at the plant and that a new representative election was to be held on July 3. He almost certainly must then have known that Bowlby's unit packing had caused the April 4 election to have been rescheduled. He further must have known then that Bowlby had issued the warnings and suspensions to its employees that were later held by the Board to have been violations of the Act, else his statement as to the employees' starting with General Wood with "clean slates" was meaningless and superfluous.

Circumstantially, it overtaxes the most naive credulity to believe that Winbourne, with the experience gained by him from his employment with and acting as a consultant for Bowlby, and having the business sophistication that he manifested by his successfully negotiating for General Wood to purchase the plant from Bowlby for over three million dollars and arranging for General Wood to hire almost all of Bowlby's supervisory force, and in so doing necessarily speaking at length with Bowlby's owners and its supervisors, did not learn of Bowlby's having committed the unfair labor practices it had committed during the Union's campaign at the plant, and if he did not learn of them in so doing, that being the prudent businessman that he was, he did not investigate and learn of them before causing General Wood to purchase the plant on June 29, nine days after he spoke to Bowlby's employees. It is thus understandable that Stanley Winbourne did not testify at the hearing held by the ALJ.

Moreover, on June 28, the eve of General Wood's purchase of the plant on June 29, the Union sent to Winbourne a Western Union mailgram stating in part:

[T]he ... [Union] continues to represent a majority of the bargaining unit employees at your newly-acquired company or at your company which you will acquire.... [Y]ou are officially on notice that the company you have acquired or will acquire has committed numerous and serious unfair labor practices such a (sic) plant closure, interrogation, threats of loss of jobs or benefits, sale of plant, subcontracting work, and promising that any problems existing at the plant would be worked out easier and better without the union and numerous other unfair labor practices. We are quite aware of what you have personally told the employees. The ... [Union] demand[s] that your company recognize the Union as the collective bargaining representative and immediately begin obeying the law and bargain with the Union and remedy all unfair labor practices committed by Burke, Parsons Bowlby and already committed by you.

In a letter dated July 6, from General Wood's attorney to the Union, General Wood acknowledged the receipt of that "telegram" and stated that General Wood declined to recognize the Union and did not accept the representations and allegations therein, and in not responding thereto did not adopt them as correct. The mailgram and letter are both in evidence.

General Wood argues that the ALJ erroneously imputed to General Wood notice, prior to its purchase of the plant, of the unfair labor practices theretofore committed by Bowlby, when at the time of that purchase General Wood only knew at most that there had been only one unfair labor charge filed against Bowlby, which was that "[o]n or about March 4, 1984, and thereafter, ... [Bowlby] interfered, restrained and coerced these employees who were forming a labor union," [22] that there was no reason at the time of that purchase for General Wood to believe that Bowlby had committed any serious unfair labor practices, especially any violation of the Act sufficient to warrant seeking a bargaining order, particularly when "Bowlby

---

22. This charge was filed by the Union on April 4, 1984, and on that date a copy thereof was mailed to Bowlby and received by it on April 6. A complaint and notice of hearing on that charge was mailed to Bowlby on May 11 and received on May 14.

had made express representations to the contrary"; that none of the arguably "hallmark" violations—unit packing, a promising and threatening letter to all employees, and warnings and suspensions directed at three Union activist employees—which Bowlby was found to have committed, had been charged against Bowlby when General Wood purchased the plant; and that the prophylactic measures mentioned in *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 185, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973), as the *quid pro quo* for the liability-after-notice rule—the purchaser's ability to secure either a reduction in the price or indemnity for assuming the predecessor's liability—cannot be undertaken as to unfair labor practices of which the purchaser had no notice, wherefore General Wood, which had no notice of any "hallmark" violations by Bowlby prior to its purchase of the plant, was unable to protect itself against a bargaining order in the documents by which it purchased the plant.[23]

General Wood further argues, or at least strongly implies, that a successor employer may not be charged with notice of its predecessor's unfair labor practices unless those unfair labor practices have been alleged in a formal charge or complaint filed against the predecessor of which the successor has notice.

■ That same argument was made, and rejected by the court, in the recent case of *NLRB v. St. Mary's Foundry Co.*, 860 F.2d 679 (6th Cir.1988), wherein the court reasoned and held:

When a successor employer knows that his predecessor is alleged to have engaged in unfair labor practices, he undertakes the business with notice of the risk that those allegations may ripen into findings of unfair labor practices which will have to be remedied, and that he may be held liable for the remedy, just as surely as if he purchased with knowledge that formal charges had been filed. In either situation, a prudent buyer would provide for the risk in the course of his negotiations with the seller. It is no more certain that the filing of formal charges of unfair labor practices will ripen into a finding of a violation of the Act, and an imposed remedy, than that the conduct complained of will lead to the filing of charges culminating in the same result. The predecessor's conduct is the same in either situation; notice of the facts and appreciation of the significance of the predecessor's conduct are the determining factors.

Of course, in this context, knowledge of the allegations or conduct contemplates an appreciation by the successor that the conduct could amount to an unfair labor practice in violation of the Act, just as knowledge of a filed charge pro-

---

**23.** The Court gathers that General Wood contends May 15, 1984, the date of the contract between Bowlby and General Wood for the sale of the plant, rather than June 29, 1984, the date that sale was consummated, to be the critical date by which General Wood must have had notice of the serious unfair labor practices committed by Bowlby if General Wood is to be held accountable here under the successorship doctrine.

That May 15, 1984, contract, which is really an option agreement, appears in the evidence as "GC [General Counsel's Exhibit] 48." In its brief, General Wood points out that Bowlby represented to General Wood therein that Bowlby had committed no unfair labor practices that would render General Wood liable if it purchased the plant.

Bowlby did represent to General Wood in that contract that there were no civil, administrative or other proceedings or investigations pending or threatened against Bowlby, which if adversely determined would result in any liability to General Wood if it purchased the plant. (Record, GC 48, sec. 4.7). However, that contract further provided that General Wood's obligation to consummate the purchase of the plant was "at its option," subject to the fulfillment of the condition that all representations made therein by Bowlby shall be true on the closing date. (*Id.*, Art. VII and sec. 7.1).

The Union's mailgram notifying General Wood of Bowlby's serious unfair labor practices was dated June 28. Even if that was the first notice thereof to General Wood, when it consummated the purchase of the plant the next day, it had the option, pursuant to the terms of the contract, to refuse to purchase the plant unless Bowlby, by indemnity or otherwise, protected it from any consequences of any unfair labor practices Bowlby had committed, which Bowlby had, in effect, therein misrepresented itself not to have committed, notwithstanding which General Wood then opted to, and did, consummate the purchase of the plant without procuring such protection from Bowlby.

vides knowledge of such a risk. To adopt a bright-line test by holding that a successor employer is liable only in the event charges have been filed, would not serve the remedial purposes of the Act. If pre-charge notice provides the same quality of information, there is no reason not to bind the successor.

*Id.* at 682. We likewise so hold. *See also NLRB v. South Harlan Coal, Inc.,* 844 F.2d 380 (6th Cir.1988).

Prior to and at the time of its purchase of the plant on June 29, 1984, General Wood had knowledge of the acts and conduct of Bowlby that the Board later held constituted unfair labor practices and then fully appreciated that those acts and conduct could amount to unfair labor practices in violation of the Act on Bowlby's part and that General Wood, as Bowlby's successor, stood an excellent chance of being held liable for remedying them and could have protected itself therefrom.

There was substantial evidence on the record to support the Board's finding and holding that prior to the purchase of the plant, General Wood had notice of Bowlby's having committed the unfair labor practices the Board held Bowlby to have committed, and the Board did not err in holding that General Wood then had such notice thereof.

### General Wood's Refusal to Hire Bowlby's Seven Employees

■ The evidence is in dispute pertaining to this issue of whether General Wood refused to hire the seven former Bowlby employees because of their pro-union activities and sentiments in violation of the Act, on the one hand, or refused to do so for other, legitimate reasons, on the other.

It is not disputed that, after General Wood purchased the plant, Steve Hutchinson was hired as its operations manager, with supervision over the plant and all of its employees, and Thomas Greene, formerly Bowlby's production manager there, was hired as General Wood's production manager there.

Hutchinson testified that on July 2, General Wood commenced taking applications for employment from applicants desiring jobs as production and maintenance employees (applications); that at that time he had no knowledge of any union activities in which any of Bowlby's former employees had engaged, except that he knew from watching television that there had been a "walkout" at the plant in February 1984; and that he never discussed the union activity of any former Bowlby employee with Greene or any other of Bowlby's supervisors and was totally unaware of any union activity of any of Bowlby's former employees when the decision was made as to whether any of them would, or would not, be hired by General Wood. He further testified that he was responsible for hiring everyone below him who worked at General Wood and that while he made the final hiring decisions, he did not review every application because the applications "were screened through Tom Greene."

Thomas Greene testified that he recommended who would be hired by General Wood. On cross-examination he testified that he did not recommend everyone who was hired and that he interviewed none of the seven former Bowlby employees that General Wood did not hire. He further testified that he recommended that Hutchinson not hire Charles Brown and George Jenkins, two of those seven employees, but made no recommendation as to the hiring of Oliver Munn, Warren Bryant, Fred (Freddie Levi) Brown, John Ganey and Greg Burton, the other five of the seven of them.

Fred (Freddie Levi) Brown testified that Hutchinson told him, and Greg Burton testified that Winbourne told him, that Greene was doing General Wood's hiring.

By their undisputed testimony, all of those seven former Bowlby employees filed applications for employment with General Wood during the period July 2 through July 6; all of them were experienced workers at the plant, five of them having commenced work there in 1979, one in 1982, and one in 1983; all of them had signed one of the petitions for union representation during February 1984, while employed by Bowlby; all had attended union meetings;

all except George Jenkins had engaged in the February 1984 "walkout" at Bowlby; and all of them had otherwise openly and actively supported the Union. Warren Bryant openly wore a "Vote Yes" button; George Jenkins told Supervisor Kenny Smith and fellow workers he favored the Union; Charles Brown told Supervisors Bill Caldwell and James Walker that the employees needed the Union; Oliver Munn passed out Union leaflets and talked favorably for the Union to fellow employees and remarked in Supervisor Smith's presence that it was "Union time"; Fred (Freddie Levi) Brown passed out Union leaflets until Supervisor Burns instructed him to cease doing so; John Ganey passed out Union leaflets and talked favorably for the Union to fellow employees until Supervisor Greene instructed him to cease doing so; and Greg Burton contacted the Union's IUD and requested that its representative talk with Bowlby's employees, was the spokesman for those employees, solicited their signatures on the petitions, and openly wore a T-shirt reading "100 percent Union."

Hutchinson testified that several employees were hired by General Wood who had no past experience in wood-treating work; that well before the plant's purchase he knew he was to be its operations manager and would superintend its entire operations; and that in late June he inventoried for General Wood all of Bowlby's assets at the plant. It is incredible that, having that knowledge and his prior training and experience in the industry,[24] Hutchinson was so imprudent that he did not learn, and as ignorant as he testified himself to be, after July 2, of the circumstances that attended the Union's campaign at the plant and Bowlby's reactions to its employees and the Union in respect thereto and also the identi-

ty of those of Bowlby's employees who were and were not active supporters of the Union.

Moreover, the reasons given by Hutchinson and Greene for refusing to hire the seven employees were vague and conclusory and more than strongly smacked of pretext: Greene was "not satisfied" with the results of Charles Brown's work at Bowlby; Hutchinson refused to hire Munn because the 910 Caterpillar lift was in two pieces when he had not enquired as to which other employees had contemporaneously operated it with Munn and their records and performance in doing so; Greene recommended against hiring Jenkins because of his stopping the machine during a downpour and Greene's issuing him the warning therefor (after the Union's campaign was well underway); Hutchinson refused to hire Bryant because he had seen him operate the "125 lift," which was demolished when General Wood bought the plant, and on cross-examination testified that he had never observed Bryant operating it; Hutchinson did not hire Fred (Freddie Levi) Brown because he was "not impressed" with the way he operated a fork lift truck; Hutchinson did not hire Ganey because he deemed him not to be a "suitable employee for what I was getting ready to embark on"; and Hutchinson did not hire Burton because General Wood did not intend to do any post pointing, when Burton had operated the post pointing machine for Bowlby for only about the last two months preceding the plant's sale and had wider experience performing other jobs at Bowlby.[25]

It was thus not without good reason that the ALJ and the Board credited the testimony of the seven employees whom General Wood refused to hire and did not credit that of Hutchinson and Greene.[26]

---

24. Hutchinson testified that he had a Bachelor of Science degree in Forest Management from West Virginia University, had worked for Bowlby on and off from 1973 to 1983, and had been employed by four other companies in the wood industry.

25. Neither Greene nor Hutchinson assigned Burton's alleged tardiness and absenteeism while he worked at Bowlby, in respect to which

Greene had issued to him the warning and the three-day suspension, as reason for General Wood's refusal to hire him.

26. In *NLRB v. Nueva Engineering, Inc.*, 761 F.2d 961, 965 (4th Cir.1985), this Court referred to the rule enunciated in *Universal Camera, supra,* that "[i]f the findings of the Board have substantial support in the record as a whole, our inquiry ends ... even though we might have

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to encourage or discourage membership in a labor organization by "discrimination in regard to hire." Hence, a successor employer is free either to hire or to refuse to hire a former employee of its predecessor, except that if the successor refuses to hire such an employee because of his pro-union activities or sentiments, and is thus motivated in refusing to do so by anti-union animus, then the successor has "discriminated in regard to hire" in respect to that employee and has thereby committed an unfair labor practice in violation of section 8(a)(3) of the Act. *See NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 280 n. 5, 92 S.Ct. 1571, 1578 n. 5, 32 L.Ed.2d 61 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 40, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987).

In *NLRB v. Nueva Engineering, Inc.,* 761 F.2d 961, 967 (4th Cir.1985), this Court explained:

> Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it unlawful to discharge a worker because of union activity. The Supreme Court has affirmed, as a uniform standard, that where an employer's opposition to protected activity is shown to be a substantial or a motivating factor in the decision to take adverse action against an employee, the employer will be found to have violated the Act unless the employer is able to demonstrate that the adverse action would have occurred in the absence of the employee's protected conduct. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 2474–2475, 76 L.Ed.2d 667 (1983); *see NLRB v. Daniel Constr. Co.,* 731 F.2d 191, 197 (4th Cir. 1984). In determining whether a section 8(a)(3) violation occurred in this case, there are two crucial inquiries. Was Nueva's decision to terminate employee Leach motivated by anti-union considera-

tions? If so, has Nueva met its burden to show that the termination would have occurred regardless of the forbidden motivations?

Turning first to the question of motive, we note that since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence. *American Thread Co. v. NLRB,* 631 F.2d 316, 321 (4th Cir. 1980); *Neptune Water Meter Co. v. NLRB,* 551 F.2d 568, 569 (4th Cir.1977).

The discharge of an employee in violation of section 8(a)(3) of the Act was involved in *Nueva Engineering, supra.* Involved here is discrimination in regard to hire in violation thereof. The above-quoted language equally applies here.

The Board found and held that a preponderance of the evidence established that General Wood violated section 8(a)(1) and (3) of the Act by its refusal to hire the above seven employees and that General Wood was motivated to do so by their having engaged in concerted activities in support of the Union. General Wood asserts that, in so doing, the Board improperly imputed to General Wood Greene's knowledge gained at Bowlby that they had done so. The evidence clearly supported that imputation. Unquestionably, Greene knew who the Union activists in Bowlby's unit were. He understandably never testified to the contrary. Having formerly been Bowlby's production manager, he came to General Wood in the same capacity, was second in command there under Hutchinson and actively participated in General Wood's hiring procedures by screening the applications, interviewing many of the applicants and recommending to Hutchinson which of most, if not all, of them should or should not be hired. As such, his knowledge was that of General Wood.[27]

---

reached a different result had we heard the evidence in the first instance," and pointed out that such was "particularly true where ... the record is fraught with conflicting testimony and essential credibility determinations have been made." (Citations omitted.)

**27.** The evidence leaves no question but that Greene acted as General Wood's agent commencing no later than July 2. *See American Press, Inc. v. NLRB,* 833 F.2d 621, 625 (6th Cir.1987).

There is substantial evidence on the record to support the Board's finding and holding that General Wood violated section 8(a)(1) and (3) of the Act by its refusal to hire the seven Bowlby employees and that General Wood was motivated to do so by its anti-union animus manifested against them because of their having engaged in concerted activities in support of the Union, and the Board committed no error by so finding and holding.

### The Successorship Issue

General Wood contends that there is not substantial evidence on the record to support the Board's finding and holding that General Wood's status as Bowlby's "successor" was such as to warrant, as a matter of law and fact, the Board's entry of its bargaining order against General Wood and that the Board erred in so doing.

In *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 262 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974), the Court remarked:

> [T]he real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative. The answer to this inquiry requires analysis of the new employer and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every context.

In *Fall River Dyeing, supra,* the Court summarized some of its pronouncements dealing with the factors which the courts must consider in making that enquiry and analysis as follows:

> In *Burns* we approved the approach taken by the Board and accepted by courts with respect to determining whether a new company was indeed the successor to the old. 406 U.S., at 280–81, and n. 4 [92 S.Ct., at 1578–79, and n. 4].

> This approach, which is primarily factual in nature and is based upon the totality of the circumstances of a given situation, requires that the Board focus on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co. v. NLRB*, 414 U.S., at 184 [94 S.Ct., at 425]. Hence, the focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. See *Burns*, 406 U.S., at 280, n. 4 [92 S.Ct., at 1578, n. 4]; *Aircraft Magnesium, a Division of Grico Corp.*, 265 N.L.R.B. 1344, 1345 (1982), enf'd, 730 F.2d 767 (CA9 1984); *Premium Foods, Inc.*, 260 N.L.R.B. 708, 714 (1982) enf'd, 709 F.2d 623 (CA9 1983).

> In conducting the analysis, the Board keeps in mind the question whether "those employees who have been retained will understandably view their job situations as essentially unaltered." See *Golden State Bottling Co.*, 414 U.S., at 184 [94 S.Ct., at 425]; *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 464 (CA9 1985). This emphasis on the employees' perspective furthers the Act's policy of industrial peace. If the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their dissatisfaction may lead to labor unrest. See *Golden State Bottling Co.*, 414 U.S., at 184 [94 S.Ct., at 425].

*Id.,* 482 U.S. at 43–44, 107 S.Ct. at 2236.

Substantial record evidence unquestionably supports the Board's finding, with which General Wood takes no issue, that on June 29, 1984, General Wood purchased

from Bowlby the physical plant and facility, including its production equipment, vehicles and inventory, hired almost all of Bowlby's supervisory staff, and on July 9 commenced to engage in the same business in which Bowlby formerly engaged, that of treating wood, including telephone poles, fence posts, pilings and other items, in the same manner in which Bowlby had treated them, and selling those items to substantially the same customers to whom Bowlby had sold them when Bowlby had owed and operated the plant.

■ General Wood rather raises other points of argument in support of its contention that it was not Bowlby's successor, arguing that even if a majority of Bowlby's employees signed petitions selecting the union as their bargaining representative at the plant, the Board failed specifically to identify which of Bowlby's former employees in the unit were hired by General Wood or what percentage of Union support existed among the employees in the newly-constituted unit at General Wood; that all reported successorship court decisions rest upon either the certification of a union as the representative of the unit in the predecessor's work force or upon the predecessor's having voluntarily recognized the union as such, in each of which circumstances the employees in the predecessor's unit are all presumptively represented by the union; and that if a majority of the employees in the predecessor's unit is hired into the successor's unit, that presumption survives, but that if a majority of them is not hired therein, then it violated Board policy to issue a bargaining order in the non-majority setting in the successor's newly-constituted unit.

It is true that the Board did not specifically identify which of Bowlby's former employees in the unit were hired by General Wood or the precise percentage of Union support that existed in the newly-constituted unit at General Wood, but the Board

was not required specifically, nor was it remiss in failing, to do so.

What the ALJ did find in this regard was the following:

[B]y the end of July [General Wood] had hired employees in virtually all pre-existing production and maintenance classifications of its predecessor, Bowlby. Over 60 percent of General Wood's employees had been employed by Bowlby, and the supervisory force remained virtually unchanged from that of Bowlby.... I thus find that General Wood is a successor of Bowlby.

The record evidence includes two documents respectively listing the employees on Bowlby's payroll ending February 12 and those of General Wood on its payroll ending July 22.[28] Thomas Greene's testimony identified the employees on Bowlby's payroll who were in its unit and those on General Wood's payroll who properly fell within its corresponding unit, and in so doing testified that three of General Wood's employees on its payroll were temporary ones and were later hired permanently.

An analysis of the employees in each of Bowlby's and General Wood's units on those respective dates and the signatures of the employees in Bowlby's unit appearing on the seven petitions reveals the following facts to have been established by a preponderance of the evidence.

Twelve of the employees in Bowlby's unit did not sign any of the seven petitions.[29] As stated above, 50 of the employees in Bowlby's unit purportedly signed the seven petitions. The evidence indicates that 45 of those 50 did so by February 9, when the Union formally demanded recognition by Bowlby and that the remaining five of the 50 respectively did so on February 16 and 29, March 17 and 21, and April 3.

---

**28.** Bowlby's February 12 payroll is exhibit GC 38; General Wood's July 22 payroll is exhibit GC 44.

**29.** The ALJ stated that 10 of those 12 Bowlby unit employees who did not sign the petitions were hired by General Wood. As this Court analyzes the evidence, only 7 of those 12 were hired by General Wood. This and other minor disparities between the ALJ's and the Court's analyses of the figures dealt with in the evidence are not critical to the decision here.

On July 12, General Wood's unit included approximately 43 employees, excluding the three then temporary ones but including Kenneth A. Smith, a former Bowlby supervisor who did not sign a petition but was hired into General Wood's unit as a pole machine operator.

Eighteen of those 43 employees in General Wood's unit, including Kenneth A. Smith, were employees who had not been in Bowlby's unit and had never had an opportunity to sign any petition opting for Union representation. An additional 7 of those 43 had been in Bowlby's unit and had had that opportunity but had declined so to opt. Thus, a total of 25, or a majority, of those 43 employees had not opted in favor of the Union.

General Wood hired only 4 of the 26 Bowlby unit employees who had signed the two petitions at the February 7 meeting attended by IUD coordinator Black. Those 26 were the most fervent Union adherents in Bowlby's unit.[30] A preponderance of the evidence established that the signatures of all 4 of them on the petitions were authentic notwithstanding that their 4 signatures were among the 15 of the 26 signatures thereon that depended solely upon Black's testimony for their authentication.[31]

Eighteen of the 43 employees in General Wood's unit were former Bowlby unit employees who purportedly signed one of the seven petitions. The signatures of 14 of those 18 were authenticated by a preponderance of the evidence; those of the remaining four of the 18 were not authenticated by any evidence.

If those 14 employees were added to the seven former employees who signed the petitions and would have been hired by General Wood but for its discriminatorily refusing to hire them instead of seven other employees it did hire,[32] then there would have been 21 of Bowlby's unit employees who had signed the petitions opting for the Union in General Wood's unit, and those 21 employees would have been only one or two employees short of a majority of the approximately 43 employees in General Wood's unit.

If all 18 of those Bowlby unit employees who purportedly signed the seven petitions were added to the 7 former Bowlby employees whom General Wood had discriminatorily refused to hire, then there would have been 25 of Bowlby's unit employees who had signed the petitions in General Wood's unit, and those 25 would have clearly constituted a majority of the approximately 43 employees in General Wood's unit.

Thus, it can be said with far greater likelihood than not that a majority of the employees in General Wood's unit would have been found to have signed the petitions opting for union representation but for General Wood's discriminatorily having refused to hire the seven former Bowlby unit employees who had signed the petitions.[33]

---

**30.** An employer's proof that it did not weed out all union adherents does not disprove a discriminatory motive otherwise established. *NLRB v. Instrument Corp. of America,* 714 F.2d 324, 325 (4th Cir.1983).

**31.** Such is statistically true notwithstanding the stochastic factor. Since Black's testimony authenticated 13 of the 15 signatures thereon that were not authenticated by other evidence, then certainly his testimony authenticated the signatures of at least 2 of those 4 employees. Moreover, since each of the signatures of the 4 of them is far more likely than not to be, and thus by a preponderance of the evidence is, among the remaining 13 of the 15 signatures thereon that his testimony did authenticate than to be any of the other 2 of the 15 signatures that his testimony did not authenticate, then the signatures of all 4 of those 4 employees were authenticated by Black's testimony. This reasoning is not inconsistent with that hereinabove by which the court pointed out that 13 of the 15 of the 26 signatures on the two petitions were authenticated by Black's testimony, since the figures analyzed there and those analyzed here differ. General Wood states that "[f]our [of Bowlby's employees] who signed the initial petitions were hired." Brief of Respondent at 15–16.

**32.** "An employer may not defeat a finding of successorship through its own discrimination." *American Press, Inc. v. NLRB,* 833 F.2d 621, 625 (6th Cir.1987).

**33.** This is a reasonable conclusion, because evidence to authenticate the signatures of Bowlby's unit employees on the petitions was offered chiefly to establish the Union's majority status in Bowlby's, and not General Wood's, unit.

General Wood further argues that the unfair labor practices committed by Bowlby were not "hallmark" violations and thus were not sufficiently serious to warrant the Board's issuance of a bargaining order against Bowlby, wherefore the Board's issuance of the one against General Wood was improper.

In this connection, the ALJ found as to Bowlby and General Wood respectively, that:

[A] bargaining order should issue against ... Bowlby in view of Bowlby's unlawful interrogation, threats, disciplinary warnings and suspension of its employees, and most significantly in its packing of the unit by importing employees to subvert the election process which dissipated the Union's majority, and also in view of the threats of plant closure, subcontracting out of work, and job loss engaged in by ... Bowlby including its threat of subcontracting and that of unspecified reprisals issued by its president. The threats of plant closure, job loss and subcontracting, as well as the unit packing, clearly constitute hallmark violations. The combination of these hallmark violations and the impossibility of remedying these violations by Bowlby as a result of its sale of the plant clearly demonstrate[s] that it is no longer possible to conduct a free and fair election. [T]he acts of General Wood by unlawfully refusing to hire known union adherents as found herein were clearly calculated to subvert the election process in order to assure a lack of union support. The passage of time and the turnover of supervisory personnel at General Wood do not serve to obliterate its bargaining obligation as a successor. *Keystone Pretzel Bakery,* 256 NLRB 334, 335 (981) (sic), enf'd. 696 F.2d 257 (2nd Cir.1983).

Had Counsel for the General Counsel introduced evidence to authenticate the signatures on the petitions of the 4 employees in General Wood's unit that the evidence did not authenticate, which it was not necessary for him to have done to establish that the Union had achieved majority status in Bowlby's unit, but which in all likelihood he would have been able to have done, since there was no evidence that any

We find no published opinion of this Court wherein it dealt with or mentioned "hallmark" violations. In *NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 212–13 (2d Cir.1980), the court pointed out that so-called "hallmark" violations had been held to include plant closure, a threat of plant closure or loss of employment, a grant of benefits to employees or the reassignment, demotion or discharge of union adherents in violation of section 8(a)(3) of the Act; that such violations will support the issuance of a bargaining order absent "significant mitigating circumstances"; that such conduct "justifies a finding without extensive explication that it is likely to have a lasting inhibitive effect on a substantial percentage of the work force"; and that "an array of less serious violations which must either be numerous or be coupled with some other factor intensifying their effect ... fall within *Gissel's* second category and support an order to bargain," thus categorizing "hallmark" violations as those falling within *Gissel's* first category.

In *NLRB v. Maidsville Coal Co.,* 718 F.2d 658, 660 (4th Cir.1983) (en banc), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 761 (1984), this Court pointed out that:

The Supreme Court in *Gissel* discussed varying factual circumstances with which the Board might be faced when deciding to issue a bargaining order *vel non* without requiring an election. The first set of circumstances consists of "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." *Gissel Packing Co.,* 395 U.S. at 613–14, 89 S.Ct. at 1940. In this category of cases, a bargaining

signer of any of the petitions had ever attempted to revoke his signature thereon, then all of those 18 employees, when added to the 7 former Bowlby employees whom General Wood had discriminatorily refused to hire, would total 25 employees in General Wood's unit who had signed the petitions, a clear majority of the approximately 43 employees in General Wood's unit.

order may issue even though the Union may not be able to prove that it ever had a majority status among employees. A second set of circumstances consists of "less extraordinary cases marked by less pervasive practices." *Id.* at 614, 89 S.Ct. at 1940. In this category of cases, if the Union at one point during the campaign held a card majority, a bargaining order should issue when:

> [T]he Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order....

*Id.* at 614–15, 89 S.Ct. at 1940; *see also id.* at 612 n. 32, 89 S.Ct. at 1939 n. 32. A third category of cases identified by the Court consist[s] of "minor or less extensive unfair labor practices, which, because of their minimal impact in the election machinery, will not sustain a bargaining order." *Id.* at 615, 89 S.Ct. at 1940.

In *Standard–Coosa–Thatcher Carpet Yarn v. NLRB*, 691 F.2d 1133, 1144 (4th Cir.1982), where the union had established a card majority, petitioned for an election which it lost and the employer had committed numerous violations of section 8(a)(1) of the Act and some violations of section 8(a)(3) thereof during the union's campaign, in enforcing the bargaining order issued by the Board, the Court stated:

> The Company [employer] responded to the Union's most recent campaign with threats of plant closure, threats of retaliation against Union activists, and discriminatory discipline aimed at thwarting unionization [enforcement of a plant rule in a manner calculated to discourage Union activities among employees]. As is widely recognized, such conduct tends "to have a lasting inhibitive effect" on employees' formulation and expression of free choice regarding unionization. *N.L.R.B. v. Jamaica Towing, Inc.,* 632 F.2d at 213. It therefore justifies a *Gissel* order unless a very strong showing

negates the inference of lasting effects. Because the record in this case reasonably supports such inferences, we cannot substitute our judgment for that of the Board.

When this Court's language quoted from *Standard–Coosa–Thatcher* next above is read in relation to that quoted from *Jamaica Towing* above, it is clear that, without referring to the employer's violations of section 8(a)(3) in *Standard–Coosa–Thatcher* as "hallmark" violations, this Court held those violations to constitute conduct that the court in *Jamaica Towing* held to be "hallmark" violations falling within the first category of unfair labor practices described in *Gissel.* It is further clear that since in *Jamaica Towing* the court designated an unlawful discharge of an employee in violation of section 8(a)(3) of the Act to be a "hallmark" violation, then General Wood's refusal to hire the seven former Bowlby employees in violation thereof would likewise constitute such a violation.

Rigging or attempting to rig an election in which candidates are standing for election to public office is criminal in most if not all jurisdictions of the United States. It has pervasive, enduring and adverse effects on the electoral process in that it thwarts the law and the public weal and creates doubt in the minds of some voters as to whether the casting of their votes in future elections is not an idle exercise and thus undermines the integrity of the system. Unit packing by Bowlby here, the counterpart of such rigging in a public election, almost certainly had equally pervasive, enduring and adverse effects upon the minds of Bowlby's employees in the unit. That Bowlby was thwarted in accomplishing its aim of unit packing to swing the election in its favor by the Board's blocking and rescheduling the election does not remove those effects of its conduct in so doing. We deem its unit packing to constitute a hallmark violation.

Bowlby thus committed violations of the Act, including repeated threats of plant closure and loss of employment and sudden enforcement of plant rules in a manner calculated to discourage Union activities

among its unit, to say nothing of its unit packing—all of which violations fell within the first category of unfair labor practices mentioned in *Gissel*—and also committed numerous unfair labor practices that fell within the second category mentioned therein. General Wood, as Bowlby's successor, thereafter refused to hire the seven former Bowlby employees and thereby committed additional violations of section 8(a)(3) of the Act, conduct that fell within that first category, and thereby added its own conduct that tended to have a lasting inhibitive effect on the employees' formulation and expression of free choice regarding unionization.

There was substantial evidence on the record to support the Board's finding and holding that General Wood was Bowlby's successor, and the Board's issuance of the bargaining order against General Wood, and the Board committed no error in so doing.

### The "Substantial and Representative Complement" Issue

■ General Wood's claim that there was not substantial evidence on the record to support the Board's finding and holding that the end of July 1984, instead of a September 1984 date, was the appropriate "substantial and representative complement" date in respect to General Wood's work force, and that the Board erred in so holding, is without merit.

In *Fall River Dyeing, supra,* the Court said:

> In deciding when a "substantial and representative complement" exists in a particular employer transition the Board examines a number of factors. It studies "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production." See *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 628 (CA9 1983). In addition, it takes into consideration "the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work ... as well as the

relative certainty of the employer's expected expansion." *Ibid.*

*Id.,* 482 U.S. at 48–49, 107 S.Ct. at 2238–39.

Hutchinson testified that when General Wood purchased the plant, it intended to operate two shifts, and that between September 1 and 15, 1984, two shifts commenced operating there. He also testified that in July 1984, when General Wood was preparing to commence operations, he instructed Greene that he did not want two shifts but rather wanted one shift that could manufacture a saleable product.

Greene testified that it was "really sketchy" when General Wood first commenced to operate the plant as to whether a second shift would be put on; that it was hard to answer whether as of the end of July General Wood's employee complement was complete, because as of July 27 he was still interviewing for four positions on the pole machine crew; that at that time the whole plant was fully operating with one shift but was not operating to full capacity, because the pole machine department was really required to work two shifts to give the framing department enough poles to keep dry kilns and the cylinders closed.

> As to this issue, the ALJ found that: General Wood obtained successorship status at least by the end of July when it hired employees in the pre-existing classifications and employed a complement of 44 unit employees. I reject ... General Wood's contention that the relevant date for examining the employee complement should be 18 September when it expanded the number of its shifts as this expansion was highly uncertain in July according to the testimony of Greene.

Considering the factors that must be considered in deciding when a "substantial and representative complement" exists as set forth in the above quoted language from *Fall River Dyeing,* there was substantial evidence on the record to support the ALJ's finding that the end of July was the appropriate "substantial and representative complement" date as to General Wood. The evidence shows that then its job classifications designated for operation of the plant were filled or substantially filled, that the

plant was in normal or substantially normal production, that the size of General Wood's complement then was not appreciably smaller than it was in September,[34] and that it was questionable at the end of July as to when if ever General Wood's complement would be expanded beyond that then existing.

As stated earlier herein, if the ALJ's findings of fact have substantial support in the record as a whole then our inquiry ends, and such is particularly true where the testimony is conflicting, as it was between that of Hutchinson and that of Greene here, and essential credibility determinations have been made by the ALJ.

We are not unmindful that an election, and not a bargaining order, is the traditional and preferred method for determining the bargaining agent for employees. *NLRB v. Apple Tree Chevrolet, Inc.*, 671 F.2d 838 (4th Cir.1982). However where, as here,

> the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies, though present, is slight and ... employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such order should issue.

*Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940–41.

For the above reasons, the Board's motion to correct the Court's February 16, 1990, decision is sustained; that decision is vacated and is replaced by the within decision;[35] and pursuant to this Court's order entered herein on April 30, 1990, the Board's petition for enforcement of its order against both Bowlby and General Wood is granted.

PETITION GRANTED.

---

**34.** General Wood's payroll ending July 22 showed a total of 74 employees, including all employees on its payroll then. Its payroll ending September 16 showed a total of 90 employees, which included all of its employees then on its payroll.

**35.** Shortly after the filing of the Board's motion to correct the Court's February 16, 1990, decision, that decision was withdrawn from publication.